# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|                    ) | |
|        Plaintiff,          ) | |
|                    ) | |
|        v.                ) | Civil Action No. 17-cv-1166 (KBJ) |

**UNITED STATES OF AMERICA,**

       Plaintiff,

       v.            Civil Action No. 17-cv-1166 (KBJ)

**$1,071,251.44 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED;**

**$347,446.93 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED;**

**$42,632.00 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED;**

**$30,258.00 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED;**

**$253,638.25 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; AND**

**$157,749.07 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED;**

       Defendants.

## MEMORANDUM OPINION ADOPTING
## REPORT & RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff United States of America commenced this civil forfeiture action *in rem* against $1,902,975.69 in illicit funds belonging to Mingzheng International Trading Limited ("Mingzheng")—a front company that existed to launder money on behalf of

the Democratic People's Republic of Korea ("North Korea"). (*See* Compl., ECF No. 1,

¶¶ 1–2.) During the course of an investigation into Mingzheng's activities, the FBI

identified the target funds as having passed through the U.S. financial system, in route

to, or from, North Korea. (*See* Aff. in Supp. of Pl.'s Mot. for Entry of Default J. &

Order of Forfeiture, ECF No. 19-1, at 3.)[1] Eventually, these funds were frozen in

accounts that Mingzheng maintained with six U.S. financial institutions, and the

government commenced *in rem* civil forfeiture proceedings against the targeted funds.

      To that effect, on June 14, 2017, Plaintiff filed a Verified Complaint for

Forfeiture *In Rem*. (*See generally* Am. Compl.) Mingzheng failed to respond, and at

the government's request, the Clerk of the Court entered a default in this case. (*See*

Clerk's Entry of Default, ECF Nos. 9–14.) The government subsequently filed a motion

for default judgment pursuant to Federal Rule of Civil Procedure 55(b), and requested

that this Court order the forfeiture of the named funds. (*See generally* Pl.'s Mot. for

Default J., ECF No. 15.) On February 2, 2018, this Court referred the government's

motion to a Magistrate Judge, and the matter was randomly assigned to Magistrate

Judge Michael Harvey. (*See* Minute Order of Feb. 1, 2018; Minute Entry of Feb. 1,

2018.) Magistrate Judge Harvey ordered two rounds of supplemental briefing from the

government and held a hearing regarding the government's motion. Then, on June 29,

2018, Magistrate Judge Harvey issued a Report and Recommendation recommending

that this Court grant the government's motion for default judgment and order that the

---

[1] Page numbers herein refer to those that the Court's electronic case filing system automatically
assigns.

$1,902,975.69 that associated with Mingzheng be forfeited. (*See* R. & R., ECF No. 20, at 2, 21.)[2]

In reaching that decision, Magistrate Judge Harvey found that the government satisfied both the substantive and procedural requirements for a default judgment, which stem from Federal Rule of Civil Procedure 55 and Supplemental Admiralty and Maritime Claims Rule G of the Federal Rules of Civil Procedure. (*See id.* at 6–19.) Starting with the procedural requirements, Magistrate Judge Harvey concluded that the government had provided more than adequate notice to the general public and the individual entities who had a known interest in the targeted funds. (*See id.* at 10–12.) *See also* Fed. R. Civ. P. Supp. R. G(4) (requiring that such notice be provided). The government notified the public by posting a notice "for 30 consecutive days on the website www.forfeiture.gov[,]" and it further provided the three potential direct claimants with reasonable notice by contacting "law enforcement officials at the U.S. embassies in these countries, and effect[ing] service consistent with each country's laws[.]" (R. & R. at 10.) As to the remaining procedural requirements, Magistrate Judge Harvey found that the government's complaint satisfied Supplemental Rule G(2)(a)–(e) because the complaint was "verified; identifie[d] the bases for jurisdiction and venue . . . ; describe[d] the property by identifying the specific amount of funds associated with Mingzheng held at each of six U.S. banks . . . ; and identifie[d] the provisions under which forfeiture is sought[.]" *Id.* at 12 (discussing Fed. R. Civ. P. Supp. R. G(2)(a)–(e).)

---

[2] The Report and Recommendation, which is 21 pages long, is attached hereto as Appendix A.

As to the substantive requirements, Magistrate Judge Harvey found that the government alleged ample facts in its complaint to establish a reasonable belief that the government could prove by a preponderance of the evidence that these funds were subject to civil *in rem* forfeiture, as required by Fed. R. Civ. P. Supp. R. G(2)(f). (*See id.* at 8, 18–19.) The government's complaint notes that no person or entity may legally assist North Korea in accessing the U.S. financial system without a license from the federal government, pursuant to regulations issued under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*, and it alleges that Mingzheng had violated that prohibition with regard to the targeted funds. (*See* Compl. ¶¶ 32–35; 37–40.) Additionally, the complaint explains that Mingzheng also violated the federal money laundering statute (*see id.* ¶¶ 1–2), which prohibits individuals from moving money within, to, or from the United States with the intent to promote a "specified unlawful activity[,]" 18 U.S.C. § 1956(a)(2)(A), such as a violation of the IEEPA, *see id.* § 1956(c)(7)(D). Either of these two alternative theories suffice to subject Mingzheng's illicit funds to civil forfeiture. *See id.* § 981. (*See also* R. & R. at 6.)

After explaining these conclusions, Magistrate Judge Harvey informed the parties of their right to file written objections to specific portions of his report, and explained that such submissions must state the basis for any objection. The parties had 14 days after they received the Magistrate Judge's Report and Recommendation to file any such objections, *see* LCvR 72.3(b), but no objections were submitted.

Given all of the above and after reviewing Magistrate Judge Harvey's report, this Court agrees with the Report and Recommendation's thorough analysis and

conclusions. The Court will therefore **ADOPT** the Report and Recommendation in its entirety. Accordingly, Plaintiff's Motion for Default Judgment will be **GRANTED** and an order of forfeiture against Mingzheng totaling $1,902,975.69 will issue.

A separate Order consistent with these conclusions will accompany this Memorandum Opinion.


DATE: August 15, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **Case No. 17-cv-01166 (KBJ/GMH)** |
| | ) |
| $1,071,251.44 OF FUNDS ASSOCIATED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) |
| | ) |
| $347,446.93 OF FUNDS ASSOCIATEED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) |
| | ) |
| $42,632.00 OF FUNDS ASSOCIATEED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) |
| | ) |
| $30,258.00 OF FUNDS ASSOCIATEED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) |
| | ) |
| $253,638.25 OF FUNDS ASSOCIATEED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) |
| | ) |
| $157,749.07 OF FUNDS ASSOCIATEED WITH MINGZHENG INTERNATIONAL TRADING LIMITED; | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff United States of America ("Plaintiff" or "the government") brought this civil for-

feiture action *in rem* against funds totaling $1,902,975.69 ("Defendant Funds") associated with

Mingzheng International Trading Limited ("Mingzheng"), which are currently held in blocked

funds accounts at six U.S. financial institutions. Plaintiff has now filed a Motion for Default Judgment pursuant to Rule 55(b) of the Federal Rules of Civil Procedure 55(b), 18 U.S.C. § 983(a)(4)(A), and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"). The motion was referred to the undersigned for a Report and Recommendation on February 1, 2018, and, after two rounds of supplemental briefing and an oral argument, is ripe for resolution.[1] For the reasons set forth below, the undersigned recommends granting Plaintiff's Motion and issuing an order of forfeiture against the Defendant Funds totaling $1,902,975.69.

## I.    STATUTORY FRAMEWORK AND BACKGROUND

On June 14, 2017, the government filed a Verified Complaint for Forfeiture *In Rem* (the "Complaint") against Defendant Funds totaling $1,902,975.69 associated with Mingzheng in connection with an alleged scheme to launder U.S. dollars on behalf of sanctioned entities in the Democratic People's Republic of Korea, commonly known as North Korea. [Dkt. 1]. This action arises from a FBI investigation of Mingzheng, a company incorporated in Hong Kong, for violations of the International Emergency Economic Powers Act (the "IEEPA"), 50 U.S.C. § 1701 *et seq.*, among other statutes. *Id.*, ¶ 1.

The IEEPA grants the President of the United States authority to regulate "any unusual and extraordinary threat," originating in whole or in substantial part outside of the U.S., to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701; [Dkt. 1, ¶ 1]. The

---

[1] The relevant docket entries for purposes of this Report and Recommendation are: (1) Plaintiff's Complaint [Dkt. 1]; (2) Plaintiff's Declaration of Publication [Dkt. 4]; (3) Plaintiff's Motion for Entry of Default Judgment and Order of Forfeiture [Dkt. 15]; (4) Plaintiff's first Supplemental Memorandum of Law in Support of Plaintiff's Motion for Entry of Default Judgment and Order of Forfeiture with Attachments [Dkt. 16 through 16-2]; (5) Warrant for Arrest *In Rem* [Dkt. 18]; (6) Plaintiff's second Supplemental Memorandum of Law in Support of Plaintiff's Motion for Entry of Default Judgment and Order of Forfeiture with Attachment [Dkt. 19 through 19-1].

authority is expansive, and includes the power to investigate, regulate, or prohibit payments "between, by, through, or to any banking institution" to the extent that they involve an interest of any foreign country or national, and to prohibit transactions involving any property in which a foreign country or national has an interest.  50 U.S.C; § 1702; [Dkt. 1, ¶ 1].  Pursuant to Executive Order 13382 and the regulations implementing it, 31 C.F.R. § 544.101 *et seq.*, no U.S. person may provide financial or other services to a person or entity listed as a "Specially Designated National," or "SDN," except as authorized or licensed by the Treasury Department's Office of Foreign Asset Controls ("OFAC"); nor may a non-U.S. person "cause the provision of financial or other services by a U.S. person for the benefit" of a SDN without the permission of OFAC.  [Dkt. 1, ¶¶ 8–9 (citing 31 C.F.R. § 544.405, 50 U.S.C. § 1705)].  Violation of those provisions is a crime pursuant to 50 U.S.C. § 1705, and 18 U.S.C. § 371 criminalizes conspiracy to violate the IEEPA.  *Id.*, ¶ 6.

U.S. financial institutions must comply with OFAC's sanctions programs, as well as with anti-money laundering requirements set forth in the Bank Secrecy Act, a statute administered by the Financial Crimes Enforcement Network ("FinCEN").  *Id.*, ¶ 11.  These anti-money laundering requirements include measures focused on regulating foreign financial institutions conducting U.S. dollar transactions, which are processed via correspondent bank accounts in the United States.[2] *Id.*, ¶ 12.  The federal anti-money laundering statute, 18 U.S.C. § 1956, makes it a crime to transport, transmit, or transfer (or attempt or conspire to transport, transmit, or transfer) funds or a monetary instrument to a place in the United States from a place outside of the United States with the intent to promote specified unlawful activity, including violating the IEEPA.  *Id.* ¶¶ 15–17 (citing 18 U.S.C. § 1956(a)(2)(A), (c)(7)(D), (h)).  A provision of the Bank Secrecy Act enacted

---

[2] A correspondent bank account is an account established by a foreign bank or financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign bank or financial institution, or to handle other financial transactions related to the foreign bank or financial institution.  31 C.F.R. § 1010.605(c).

as Section 311 of the USA PATRIOT Act provides FinCEN a range of options, known as "special measures," to be used to target money laundering and terrorist financing concerns.  *Id.*, ¶ 20 (citing 31 U.S.C. § 5318A).  Violation of such special measures is a crime pursuant to 31 U.S.C. § 5322. *Id.*

Finally, any property that constitutes or is derived from proceeds traceable to a violation of the IEEPA, and any property involved in a transaction or attempted transaction that violates the federal anti-money laundering statute, is subject to forfeiture.  *Id.*, ¶¶ 18–19 (citing 18 U.S.C. § 981(a)(1)(A), (C)).

In March 2013, OFAC denominated North Korea's primary foreign exchange bank, the state-run Foreign Trade Bank, a SDN.  *Id.*, ¶¶ 1, 32.  In May 2016, FinCEN made a Section 311 finding deeming the entire North Korean financial sector as a primary jurisdiction of money-laundering concern, noting that it consists exclusively of state-controlled financial institutions, which continue to use front companies to conduct transactions supporting the proliferation of weapons of mass destruction and development of weapons in violation of international and U.S. sanctions. *Id.*, ¶¶ 22–23.  According to the Complaint, investigations by law enforcement have discovered that North Korean financial facilitators engage in wire transfers of payments denominated in U.S. dollars from foreign financial institutions overseas, which are cleared through a U.S. correspondent bank account and then transmitted to offshore accounts maintained by front companies on behalf of North Korean financial institutions.  *Id.* at 25.  Pursuant to a restructuring of the North Korean banking industry in the early- to mid-2000s, North Korean banks are required to maintain currency clearing accounts at the Foreign Trade Bank, which are used to clear transactions among North Korea's commercial banks.  *Id.*, ¶ 31. FinCEN's Section 311 finding specifically noted that

the Foreign Trade Bank used front companies to facilitate transactions, processed through U.S. correspondent accounts, involving millions of U.S. dollars. *Id.*, ¶¶ 34–35.

The Complaint alleges that confidential sources have identified Minzheng as a front company laundering U.S. dollar payments on behalf of the Foreign Trade Bank through a covert Chinese branch of the bank in Shenyang. [Dkt. 1, ¶¶ 37–40]. The government has identified twenty U.S.-dollar wire transfers in October and November 2015 (comprising the Defendant Funds) either sent or received by Minzheng, each of which was subject to a blocking order by OFAC because it involved a SDN—namely, the Foreign Trade Bank—whose property and interests in property are blocked pursuant to U.S. law.[3] [Dkt. 1, ¶ 45; Dkt. 19-1 at 4–5]. It asserts, based on information from a confidential source, that many of these transfers included coded numbers used by the Foreign Trade Bank to instruct Kim Tong Chol to make the payments. [Dkt. 1, ¶ 42; Dkt. 19-1 at 6–7]. According to the government, other transactions involved a party that was previously used as a supplier for North Korean purchases managed by the Foreign Trade Bank, a front company operated by a covert Foreign Trade Bank branch, and other front companies allegedly associated with the Foreign Trade Bank. [Dkt. 19-1 at 7–10]. The government alleges that all of these transactions were made on behalf of the Foreign Trade Bank [Dkt. 19-1 at 5] and that they were accomplished without a license from OFAC [Dkt. 1, ¶¶ 59–60].

In addition, the Complaint and the government's other submissions allege that Minzheng conducted numerous illegal transactions with North Korean financial facilitators, such as Dandong

---

[3] In the summer of 2017, after the conduct at issue in this case, OFAC designated as SDNs Minzheng, Minzheng's owner, Sun Wei, and the Foreign Trade Bank's representative in the People's Republic of China, Kim Tong Chol. More specifically, in June 2017 OFAC designated Sun Wei, noting that he had been closely aligned with the Foreign Trade Bank, in August 2017 designated Minzheng for acting as a front company for the Foreign Trade Bank, and in September 2017 designated Kim Tong Chol. [Dkt. 19-1 at 6].

Hongxiang Industrial Development Company Ltd., an entity—sanctioned by the Treasury Department and the subject of federal criminal charges in the District of New Jersey—that acted for a sanctioned North Korean bank that is subordinate to the Foreign Trade Bank; ZTE Corporation, a company which the government alleges has significant relationships with North Korean commercial enterprises, and which recently pled guilty to violations of U.S. sanctions; and Dandong Kehua Economy and Trade Co., and Dandong Zhicheng Metallic Material Co., Ltd, companies designated by OFAC as SDNs for violations of sanctions against North Korea. [Dkt. 1, ¶¶ 47–58; Dkt. 19-1 at 10–13].

In light of these allegations, the government seeks forfeiture of $1,902,975.69 in funds pursuant to 18 U.S.C. § 981(a)(1)(A), which authorizes forfeiture of property "involved in a transaction or attempted transaction in violation of [18 U.S.C. §] 1956," the federal money laundering statute, and pursuant to 18 U.S.C. § 981(a)(1)(C), which authorizes forfeiture of property "which constitutes or is derived from proceeds traceable to a violation" of the IEEPA.[4]

## II.   LEGAL STANDARDS

Rule 55 of the Federal Rules of Civil Procedure sets out a two-step process for entry of a default judgment. *See Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, No. 16-CV-01424 (CRC), 2017 WL 3475014, at *2 (D.D.C. Aug. 11, 2017). A party must first request the Clerk of Court to note default against the defendant for failing to "plead or otherwise defend." *Id.* (quoting Fed. R. Civ. P. 55(a)). Rule 55 then allows a court to enter a default judgment upon the party's request. Fed. R. Civ. P. 55(b)(2). Default judgment "must normally be

---

[4] Specifically, section 981(a)(1)(C) authorizes forfeiture of proceeds traceable to "any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7)), or a conspiracy to commit such an offense." Section 1956(c)(7)(D) includes in its definition of "specified unlawful activity" an offense under "section 206 (relating to penalties) of the International Emergency Economic Powers Act." *See also, e.g.*, *In re 650 Fifth Ave. and Related Props.*, 830 F.3d 66, 86–87 (2d Cir. 2016); *United States v. Alamoudi*, 452 F.3d 310, 313 (4th Cir. 2006).

viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.3d 689, 691 (D.C. Cir. 1970)). However, a notation of default against a defendant does not automatically entitle a plaintiff to a default judgment; instead, "the defendant['s] default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008) (quoting *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005)); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 n.23 (2d Cir. 2011) (stating, "Most of our sister circuits appear to have held expressly that a district court may not enter a default judgment unless the plaintiff's complaint states a valid facial claim for relief," and collecting cases from the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits); *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) ("Default [judgment] establishes the defaulting party's liability[] for the well-pleaded allegations of the complaint."). Thus, "[c]onceptually, . . . a motion for default judgment is like a reverse motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015).

Rule 8 of the Federal Rules of Civil Procedure sets out the standard for the sufficiency of a complaint in a civil action *in personam*. Under that rule, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has held that this standard does not require "detailed factual allegations," but must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, a complaint "must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To meet this standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Pleading requirements in civil forfeiture actions are governed by the Supplemental Rules and by the Federal Rules of Civil Procedure, to the extent they are "not inconsistent with the[] Supplemental Rules." Fed. R. Civ. P. Supp. R. A(2). Supplemental Rule G sets the specifications of a complaint in an *in rem* forfeiture action. In relevant part, the complaint must be verified, state the grounds for jurisdiction, describe the property "with reasonable particularity," identify the statute under which the action is brought, and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."[5] Fed. R. Civ. P. Supp. R. G(2). Although this pleading standard has been considered "a higher standard of pleading" than that of Rule 8, *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), courts have found that the standards of Rule 8 "may help to clarify when a civil forfeiture complaint" states a claim, *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).[6]

## III. DISCUSSION

### A. Jurisdiction and Venue

The Complaint asserts that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Pursuant to section 1355, district courts "have original jurisdiction . . . of any

---

[5] The government's burden at trial is to "establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).

[6] Indeed, the court in *$22,173.00 in U.S. Currency* suggested that the Supreme Court's reassessment of Rule 8 in *Iqbal* and *Twombly*, which set a plausibility standard for pleading a cause of action under that rule, brings the Rule 8 pleading standard in line with that of Supplemental Rule G. *See* 716 F. Supp. 2d at 249 & n.25.

action or proceeding for . . . forfeiture, pecuniary or otherwise, incurred under any Act of Congress," with the exception of certain matters, not at issue here, within the exclusive jurisdiction of the Court of International Trade. 28 U.S.C. § 1355. As noted above, this action seeks forfeiture under federal law, and therefore this Court has subject matter jurisdiction. The Court also has jurisdiction under 28 U.S.C. § 1345, which provides the district courts with jurisdiction over proceedings commenced by the United States.

Section 1355 also provides for venue in forfeiture actions in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A). As the Complaint details, the Defendant Funds are subject to forfeiture because the interested parties failed to procure licenses from OFAC, which is located in Washington, D.C. [Dkt. 1, ¶¶ 6, 8–9, 18–19, 59–60; Dkt. 19 at 13 ("Each payment involving the defendant properties required a license from OFAC, because the transactions were for the benefit of [the Foreign Trade Bank], a sanctioned entity. Yet for each payment, Minzheng failed to obtain the requisite license.")]. That omission is sufficient to support venue in this district. *Cf. United States v. Hassanshahi*, 185 F. Supp. 3d 55, 57 (D.D.C. 2016) (holding, in criminal case charging exporting of goods and services to Iran without having received OFAC license, venue proper in this district because the failure to procure the license from OFAC occurred in the District of Columbia).

### B.     Notice

Before a default judgment is entered pursuant to a complaint for forfeiture *in rem*, the government must show that it complied with the notice requirements contained in the Supplemental Rules.[7] *See, e.g.*, *United States v. $47,000 in U.S. Funds Associated with JP Morgan Chase Account Nos. XXXXXX3282, XXXXX0170*, No. 17-cv-2233 (ABJ), 2018 WL 3014823, at *3 (D.D.C.

---

[7] Supplemental Rule G(3)(b)(i) requires the government to obtain an arrest warrant from the Clerk of Court for property in the government's control that is not real property. Here, as the government explained at oral argument, the

June 15, 2018) (evaluating plaintiff's compliance with notice requirements of Supplemental Rule G before granting motion for default judgment); *United States v. $4,620 in U.S. Currency*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) (same); *United States v. One Cardboard Box Containing $50,900 in Mutilated U.S. Currency*, 658 F. Supp. 2d 214, 216 (D.D.C. 2009) (same).

Supplemental Rule G(4) requires the government to provide notice to the public via publication, and notice to potential claimants via direct notice. Notice by publication must describe the property, state the time to file a claim and answer, and name the government attorney to be served with the claim and answer. Fed. R. Civ. P. Supp. R. G(4)(a)(ii). Notice is sufficient if it is published "on an official internet government forfeiture site for at least 30 consecutive days." Fed. R. Civ. P. Supp. R. G(4)(iv)(C). The government's publication, which was posted for 30 consecutive days on the website www.forfeiture.gov, met those requirements. [Dkt. 4].

Direct notice must be sent "to any person who reasonably appears to be a potential claimant" and sent "by any means reasonably calculated to reach the potential claimant." Fed. R. Civ. P. Supp. R. G(4)(b)(i), (iii)(A). "Reasonable notice . . . requires that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice." *Mesa Valderrama v. United States*, 417 F.3d 1189, 1197 (11th Cir. 2005). Here, the government identified and obtained contact information for potential claimants in China, the United Kingdom, and Switzerland, based on its investigation. [Dkt. 15-1 at 8]. The government contacted law enforcement officials at the U.S. embassies in these countries, and effected service consistent with each country's laws: service by international package service to parties in China and the United Kingdom, and service through a Mutual Legal Assistance Treaty

---

funds are in the control of the Treasury Department pursuant to OFAC's blocking orders, which prevent any person or entity from accessing those funds without OFAC's permission. The government has complied with Supplemental Rule G(3)(b)(i) by obtaining such a warrant for the Defendant Funds. [Dkt. 18].

request to the potential claimant in Switzerland.  *Id.* at 8–9.  That is more than sufficient under

Supplemental Rule G(4)(b).  *See, e.g.*, *United States v. Funds Up to and Including the Amount of*

*$56,634 in U.S. Currency on Deposit in Banesco Int'l, Panama, Acct. # 201000274785, Titled in*

*the Name of Inversiones Cedeno C.A., and/or Prop. Traceable Thereto*, 79 F. Supp. 3d 112, 114

(D.D.C. 2015) (finding notice reasonably calculated to reach potential claimants where funds were

restrained, the government attempted but failed to obtain contact information for account holders

in order to provide direct notice, and public notice was posted on government forfeiture website).

As no individual or entity claimed any of the funds following publication and direct notice,

and the deadline to do so has passed [Dkt. 15 at 7, 9], default may be entered provided that the

Complaint is sufficient under Supplemental Rule G(2).[8]

### C.    Adequacy of the Complaint

As noted, Supplemental Rule G includes five relevant elements that must be included in a

complaint in an action for forfeiture *in rem*.  Four of these are largely formal, and one is substan-

tive.  As to the formal requirements, the complaint must be verified; state the basis for subject

matter jurisdiction, jurisdiction over the property, and venue; describe the property with reasonable

particularity; and identify the statute under which the forfeiture is sought.  Fed. R. Civ. P. Supp.

R. G(2)(a)–(c), (e); *see also United States v. Approximately $35,900.00 in U.S. Currency*, No.

---

[8] At oral argument, the Court inquired whether the Complaint should have been served pursuant to the rules governing service on a foreign country, in light of the fact that the funds at issue are purportedly connected to a state-run North Korean bank.  The government responded [Dkt. 19 at 4 n.1], and is correct that there is no basis to suggest that service of process related to defendant funds that may belong to a foreign government must follow the requirements of Rule 4(j)(1), which mandates service on a foreign state to be accomplished in accordance with 28 U.S.C. § 1608.  The defendant here is not a foreign state; rather, the defendant is the *in rem* Defendant Funds.  *See, e.g.*, *United States v. $22,050.00 U.S. Currency*, 595 F.3d 318, 320 n.1 (6th Cir. 2010) ("[T]he government does not have to comply with the formal service of process provisions of Federal Rule of Civil Procedure 4 when providing notice of forfeiture to potential claimants. This is because potential claimants are not defendants in an *in rem* action, the seized objects or assets are.").  Moreover, the notice requirements of Supplemental Rule G are inconsistent with Rule 4's requirements, and therefore supplant them pursuant to Supplemental Rule A(2).  For the same reasons, there was no need to comply with Rule 4(f), which governs service on an individual in a foreign country.

1:12-CV-00254-LJO-SKO, 2017 WL 4818703, at *4 (E.D. Cal. Oct. 25, 2017) (citing Fed. R. Civ. P. Supp. R. G(2)).  Here, those provisions are met.  The Complaint is verified; identifies the bases for jurisdiction and venue as discussed above; describes the property by identifying the specific amount of funds associated with Minzheng held at each of six U.S. banks, as well as providing details on the wire transfers in which these funds were moved; and identifies the provisions under which forfeiture is sought as 18 U.S.C. § 981(a)(1)(A), which permits forfeiture of property in-volved in money laundering, and 18 U.S.C. § 981(a)(1)(C), which permits forfeiture of property traceable to violations of the IEEPA.  [Dkt. 1, ¶¶ 1–4, 45, 59–66].

As to the substantive component—that is, a complaint with a sufficiently detailed factual basis "to support a reasonable belief that the government will be able to meet its burden of proof at trial"—the government suggests that there is no need to inquire into the adequacy of the Complaint's substantive allegations, because "[t]he court's primary inquiry when considering default is whether notice has been adequately served, and if any party filed a timely claim."  [Dkt. 19 at 17].  At least one case in this district appears to support that argument.  In *United States v. $31,178.17 in Funds from Schwab One Money Market Acct. No. 4263-7759, Held in the Names of Lawrence Hemphill and Gwendolyn M. Hemphill*, 468 F. Supp. 2d 1, 2–3 (D.D.C. 2006), the dis-trict court granted the government's motion for default judgment after noting that it had provided proper notice to potential claimants, reasoning that "no party has either opposed the Motion for Default Judgment and Decree of Forfeiture or filed a verified claim as to the *in rem* defendant funds" and so the motion was conceded.  *Id.* at 3.  In a footnote, the court stated, "*Even if an opposition had been filed*, the Court finds that the well-pleaded complaint and the facts put forth at [the criminal trial of the alleged owner of the defendant funds] allege sufficient facts for the

Court to find, by a preponderance of the evidence, that the *in rem* defendant funds are [forfeitable]." *Id.* at 3 n.1 (emphasis added). Thus, the court indicated that a review of the allegations in an *in rem* forfeiture complaint is required in connection with a default judgment only if a claimant appears. The government has not convinced the undersigned that such a view comports with the legal requirements for entry of a default judgment.

As noted, pursuant to Supplemental Rule G(2), a complaint for forfeiture *in rem* must exhibit certain essential features, such as verification, identification of applicable statutes, and description of the property. The government does not argue that a complaint that failed to contain such basic information would be sufficient to support a default judgment. And if those elements are mandated before a default judgment can be entered, it is not clear why the substantive requirement that the complaint include an adequate factual basis should be considered somehow less necessary. Indeed, the direct notice requirements of Supplemental Rule G(4)(b) mandate that a copy of the complaint be sent to potential claimants along with information regarding deadlines and service of any claims or responses. Without an adequately detailed complaint, a claimant would not have sufficient information to frame a response, which is the most basic requirement of a case-initiating pleading. *See, e.g.*, Fed. R. Civ. P. Supp. R. E(2)(a) (generally requiring complaints in *in rem* cases to contain sufficient facts to "commence an investigation and frame a respons[e]"); *see also* Fed. R. Civ. P. Supp. Rule G, advisory committee notes to 2006 adoption (noting that standard for complaint for forfeiture *in rem* in Supplemental Rule G(2) derives from standard in Supplemental Rule E(2)(a)); *cf. Ciralsky v. Cent. Intelligence Agency*, 355 F.3d 661, 670 n.9 (D.C. Cir. 2004) ("[A] complaint may be struck under Rule 8 if it 'is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading'" (quoting *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996))). There is an argument, therefore, that the notice requirements

of Supplemental Rule G(4)(b), which the government admits must be followed if a default judgment is to be entered, would not be discharged by a complaint that contained an inadequate factual basis for forfeiture.

Second, and perhaps more importantly, the government does not explain how the proposition that a default judgment can be granted on the basis merely that the plaintiff complied with the mechanics of providing notice to potential claimants is consistent with the general rules governing default judgments—*i.e.*, that a default judgment can be entered only on a complaint that has stated a viable claim, which, in the domain of forfeitures *in rem*, is defined by Supplemental Rule G as demanding "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Moreover, the cases that the government cites to buttress its contrary suggestion do not actually support that position. Rather, many of them clearly do consider whether the forfeiture complaint stated a claim prior to entering a default judgment. *See, e.g.*, *$4,620 in U.S. Currency*, 779 F. Supp. 2d at 67 ("The Court finds that the defendant property was used or intended to be used to facilitate a violation of the Controlled Substances Act . . . ."); *United States v. 1999 Lexus GS400*, No. C 05-1139 PJH, 2007 WL 1056791, at *3 (N.D. Cal. Apr. 6, 2007) ("By his or her default, the true owner of the Davis Industries P–380 handgun and accompanying [.]380 caliber ammunition has admitted the well-pleaded averments of the complaint, including that the property is subject to forfeiture because it was used or intended to be used to facilitate the transportation, sale, receipt, possession and concealment of controlled substances and the proceeds thereof."); *see also, e.g.*, *$47,000 in U.S. Funds Associated with JP Morgan Chase Acct. Nos. XXXXXX3282, XXXXX0170*, 2018 WL 3014823, at *3 ("Plaintiff's verified complaint establishes the facts necessary to support a civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C)."); *United States v. Proceeds of Drug Trafficking Transferred to Certain Foreign Bank*

*Accts.*, 757 F. Supp. 2d 24, 28 (D.D.C. 2010) ("Because the government has demonstrated that the money contained in the defendant accounts is subject to forfeiture and the connection between that laundered money and the sale of narcotics . . . is substantial, the government has met its burden for a default judgment."); *United States v. 2 N. Adams St.*, No. 08-cv-2205 (RMC), 2010 WL 6714756, at *2 (D.D.C. Mar. 31, 2010) (finding "a legal and factual basis for . . . forfeiture exists as set forth in the complaint and has been established before the Court since the filing of the complaint"). And, although the D.C. Circuit has indicated, albeit in a different context, that "greater flexibility" is due plaintiffs in a case in a default posture because their ability to discover supporting evidence is hindered, *Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005), that principle does not justify the view that the plaintiff's substantive burden evaporates completely. Thus, the government's position should be rejected.

At the other end of the spectrum, the government has addressed, at the Court's request, whether the forfeiture claim must be proved by a preponderance of the evidence at the default stage. The government's contention that such a standard is "mistaken[]" is well-taken. Again, such a standard is inconsistent with Supplemental Rule G's requirement that a complaint include facts supporting a "*reasonable belief* that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(f) (emphasis added); *see also $22,173.00 in U.S. Currency*, 716 F. Supp. 2d at 248 ("The issue is one of pleading, not proof at trial."). The government cites *United States v. One 2003 Mercedes Benz CL500, VIN WDBPJ75J353A033241*, No. PWG-11-3571, 2014 WL 7335776 (D. Md. Dec. 17, 2014) to suggest that some courts (wrongly) apply a preponderance of the evidence standard at default. However, that case did not actually apply such a standard. To be sure, in the opinion that granted the government's renewed motion for default judgment, the court stated that the government's supplemental evidence had "now . . . shown by a

preponderance of the evidence that [the] payment for the Mercedes was proceeds from drug transactions." *Id.* at *1. However, the history of that case shows that the court recognized the proper standard as the one from Supplemental Rule G(2)(f). The case concerned the forfeiture of an automobile allegedly purchased in part with the proceeds from illegal drug activity. *Id.* at *1. In an opinion denying the government's original motion for default judgment, the court reasoned that the government had "failed to establish by a preponderance of the evidence that there was a substantial connection between the Mercedes and [the] illegal drug activity." Memorandum Opinion at 8, *United States v. One 2003 Mercedes Benz CL500, VIN WDBPJ75J353A033241*, Case No. PWG-11-3571 (D. Md. July 15, 2013), ECF 9. The government moved for reconsideration, arguing that (1) the court should enter a default judgment based solely on the fact that the government had complied with the notice requirements of Supplemental Rule G(4) and (2) if the court declined to do so on that basis, it should nevertheless enter a default judgment because the complaint set forth sufficient facts to support a reasonable belief that the government would be able to meet its burden at trial, noting that "no court, as far as we have been able to determine, has required the [g]overnment to establish the *forfeitablility* of the property by a preponderance of the evidence" on a motion for default judgment. Government's Motion for Reconsideration of Denial of Default Judgment at 8, 11–12, *One 2003 Mercedes Benz CL500* (D. Md. July 29, 2013), ECF 12. The court denied the motion for reconsideration on both grounds, but acknowledged that the proper standard required the court to "review[] the complaint for facts sufficient to 'support a reasonable belief' that the [g]overnment will be able to prove forfeitability *at trial* by a preponderance of the evidence," and therefore "correct[ed]" any inconsistent holding in the prior opinion. Memorandum Opinion at 5 n.4, *One 2003 Mercedes Benz CL500* (D. Md. Oct. 3, 2013), ECF 13. In light of this correction, it appears that when the subsequent opinion parroted a preponderance of the

evidence standard, it was merely using imprecise language or a shorthand, rather than holding that the proper standard when reviewing an *in rem* forfeiture complaint on a motion for default judgment is whether the complaint establishes by a preponderance of the evidence that the property should be forfeit.[9]

Having established that to succeed on its motion, the government's facts must support a reasonable belief that it would meet its burden of proof at trial, the question is whether the Complaint has met that standard. The government has adequately established the legal basis for its claim. That is, it has shown that the Foreign Trade Bank has been denominated a SDN, such that a person or entity making U.S. dollar transactions on its behalf must obtain a license or authorization from OFAC. *See* 31 C.F.R. §§ 510.201(a), (b), (f) (blocking transfer without license of property of SDNs in U.S. control); 31 C.F.R. § 510.404 (blocking transactions incident to licensed transactions with SDNs); 31 C.F.R. § 510.405 (blocking services performed in the U.S. on behalf of SDNs); *cf. In re 650 Fifth Ave. and Related Props.*, No. 08 Civ. 10934 (KBF), 2013 WL 12335763, at *1 (S.D.N.Y. Aug. 29, 2013) ("In the *in rem* forfeiture action, the primary question is whether the proceeds of the defendant in rem properties were used to provide goods or services to Iran without the proper OFAC license, or were used in money laundering transactions."). A transfer of U.S. dollars by a SDN without an OFAC license violates the IEEPA and the federal money laundering statute. *See, e.g.*, *United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Co.*, Nos. 17-mj-217-DAR-BAH, *et al.*, 2017 WL 3233062, at *1, 5

---

[9] The court in *Proceeds of Drug Trafficking Transferred to Certain Foreign Bank Accts.*, 757 F. Supp. 2d at 27–28, appears to apply a preponderance of the evidence standard in deciding a motion for default in an *in rem* forfeiture case. However, the opinion does not mention Supplemental Rule G, and the cases it cites to support imposition of that standard are not default cases, but rather cases in which the forfeiture was opposed. *See, e.g.*, *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 659 (6th Cir. 2003) (noting that claimants appealed from grant of summary judgment in favor of government); *United States v. Brock*, 747 F.2d 761, 762 (D.C. Cir. 1984) (per curiam) (claimants appealed after judgment in bench trial); *United States v. $21,510 in U.S. Currency*, 292 F. Supp. 2d 318 (D.P.R. 2003) (decision on government's contested motion for summary judgment); *United States v. One 1988 Tractor*, 288 F. Supp. 2d 710, 711 (W.D. Va. 2003) (decision after bench trial of government's forfeiture claim).

(D.D.C. May 22, 2017) (explaining that foreign entities that are acting on behalf of North Korean entities that are SDNs have committed violations of IEEPA and the money laundering statute by conducting U.S. dollar wires without first obtaining a license from OFAC). The Complaint alleges that the transactions at issue were accomplished without such a license. [Dkt. 1, ¶¶ 4, 59]. And 18 U.S.C. § 981 subjects to forfeiture property "involved in a transaction or attempted transaction in violation of [18 U.S.C. §] 1956" and property "which constitutes or is derived from proceeds traceable to a violation" of the IEEPA. 18 U.S.C. § 981(a)(1)(A), (C).

It must therefore be determined whether the Complaint alleges sufficient facts to support a reasonable belief that the government would be able to show at trial by a preponderance of the evidence that the transactions at issue were made on behalf of the Foreign Trade Bank. That standard, which is not particularly onerous, *see, e.g.*, *United States v. Aguilar*, 782 F.3d 1101, 1108–09 (9th Cir. 2015) (noting that Supplemental Rule G(2) as derived from Supplemental Rule E(2)(a), "does not articulate an onerous standard," but presents a "low bar"), is particularly appropriate in the default setting, where a court should exercise "greater flexibility" in judging factual allegations. *Mwani*, 417 F.3d at 7. That standard is easily met here.

The Complaint fairly alleges that North Korean financial institutions continue to access the U.S. financial system using front companies that maintain offshore U.S. dollar accounts for the purpose of laundering money. [Dkt. 1, ¶¶ 23–25]. Those funds must be cleared through a U.S. correspondent bank account, which triggers U.S. economic sanctions. *Id.*, ¶ 25. The Foreign Trade Bank, which "act[s] as the umbrella bank for foreign currency transactions in North Korea" engages in such money laundering. *Id.*, ¶ 32–35. Minzheng is a front company for the Foreign Trade Bank and it has "made illicit U.S. dollar payments directly for the benefit of the North Korean government." *Id.*, ¶ 37–40. The Complaint further alleges that the twenty wire transactions that

transferred the Defendant Funds were made on behalf of the Foreign Trade Bank. *Id.*, ¶¶ 45–46. These allegations, which must be taken as true for the purposes of a motion for default judgment, *see, e.g.*, *Boland*, 763 F. Supp. 2d at 67, sufficiently establish a reasonable basis to believe that the government would be able to meet its burden at trial.

But the government's supplemental submissions supply further support. In an affidavit, the same FBI Special Agent who verified the Complaint asserts that Minzheng was never used as a legitimate business, but existed only to launder money for the Foreign Trade Bank's covert branch in Shenyang, China. [Dkt. 19-1 at 3–4]. He further links ten of the payments, totaling just over $1,000,000, to the Foreign Trade Bank on the basis of coded payment instructions from that bank either shared in wire transaction information or routed through one of the government's confidential sources. *Id.* at 4–7. The remaining ten payments are also connected to the Foreign Trade Bank and other North Korean entities:

- A payment of over $162,000 was transferred to Minzheng by a counterparty that had previously received a coded payment instruction from Foreign Trade Bank headquarters in North Korea. *Id.* at 7.

- A payment of over $42,000 was transferred to Minzheng from a front company for the Foreign Trade Bank branch in Zhuhai, China. *Id.* The government alleges that this payment is evidence of a common money laundering practice known as "layering," in which funds are moved back and forth between branches in order to conceal the source and nature of the funds. *Id.* at 7–8.

- A payment of just under $10,000 was characterized on a chart (used by Kim Tong Chol, the Foreign Trade Bank representative in Shenyang, and provided to law enforcement by a confidential source) as a wire request from the Foreign Trade Bank in Shenyang. *Id.* at 8.

- A payment of over $162,000 was transferred to Minzheng from a Chinese rubber supplier—rubber is a commodity sought by North Korea—for delivery to a port in China known as a departure point for goods smuggled into North Korea. *Id.*

- A payment to Minzheng of almost $300,000 came from a counterparty that executed a contract (provided to law enforcement by a confidential source) with Kim Tong Chol to transship commodities into North Korea. *Id.*

- Two payments to Minzheng totaling almost $50,000 were from a counter-party that executed a commodity sales agreement with a company based in Pyonyang, North Korea. *Id.* at 8–9. That contract was in the possession of Kim Tong Chol and provided to law enforcement by a confidential source. *Id.* After OFAC blocked those two payments, the government alleges that Minzheng collaborated with the counterparty to create a fraudulent contract listing Minzheng, rather than the North Korean company, as the seller. *Id.* at 9.

- A payment of $140,000 was made to Minzheng from a company that had recently been registered in Hong Kong, and that had the hallmarks of a front company for the Foreign Trade Bank. *Id.* Transactions by this putative front company were all for commodities sought by North Korea. *Id.*

- Two payments totaling almost $158,000 were made to Minzheng on the same day from a different counterparty with the hallmarks of a front com-pany for the Foreign Trade Bank that operated out of an address used by over fifty other suspected front companies. *Id.* The government alleges that those payments were part of a layering scheme. *Id.* at 9–10.

Each of these twenty transactions moving the Defendant Funds was blocked by OFAC on a deter-mination that each involved a SDN.[10] *Id.* at 5; *see In re 650 Fifth Ave. and Related Props.*, No 08 Civ. 10934, 2013 WL 2451067, at *5–6 (S.D.N.Y. June 6, 2013) (OFAC determinations subject to "deference even greater than that afforded an administrative agency . . . under *Chevron*" (citing *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994))). The government has thus surpassed its burden under Supplemental Rule G(2) to plead sufficient facts to support a reasonable belief that it would be able to meet its burden at trial to show that the funds were forfeitable by a preponderance of the evidence.

---

[10] The fact that the funds are blocked is not an impediment to forfeiture. *See, e.g.*, *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 627 (7th Cir. 2015) (approving forfeiture to the government of funds blocked by OFAC for violation of the IEEPA).

Because the Complaint states a claim for forfeiture *in rem* pursuant to Supplemental Rule G(2), the government has complied with the notice requirements of Supplemental Rule G(4), and no claimant has appeared in this action, the government's motion for default judgment should be granted.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that the government's Motion for Default Judgment [Dkt. 15] be **GRANTED** as to $1,902,975.69 of funds associated with Minzheng International Trading Limited.

*       *       *       *       *

The parties are hereby advised that under the provisions of Local Civil Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Date:  June 29, 2018

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE